110 Ill. App.3d 129 (1982)
441 N.E.2d 1179
ILLINOIS HOUSING DEVELOPMENT AUTHORITY et al., Plaintiffs-Appellants,
v.
M-Z CONSTRUCTION CORP. et al., Defendants.  (Seymour S. Goldstein, Ltd., et al., Defendants-Appellees.)
No. 81-1974.
Illinois Appellate Court  First District (4th Division).
Opinion filed September 2, 1982.
Rehearing denied November 18, 1982.
*130 Alan S. Ganz, Stephen D. Sharp, and Richard L. Ingram, all of Rooks, Pitts, Fullagar & Poust, of Chicago, for appellant Illinois Housing Development Authority.
Carol A. Kipperman, of Wilson & McIlvaine, of Chicago, for appellants Schaumburg Green Associates and Chicago Title and Trust Company.
*131 Stephen J. Feinberg, of Asher, Goodstein, Pavalon, Gittler, Greenfield and Segall, of Chicago, for appellees.
Affirmed in part, and reversed and remanded in part.
PRESIDING JUSTICE JOHNSON delivered the opinion of the court:
Plaintiffs, Illinois Housing Development Authority (IHDA or Authority), Schaumburg Green Associates, and Chicago Title and Trust Company, appeal an order of the trial court dismissing counts I, II and III of their fifth amended complaint against defendants, Seymour S. Goldstein, Ltd. (Architect), and Seymour S. Goldstein, an individual (Goldstein). The issues raised for review are (1) whether the 6-month period for submission of disputes under the construction contract between the owner and the general contractor to IHDA for arbitration is a period of limitations for a lawsuit by the owner and IHDA against Architect and Goldstein; (2) whether IHDA is a third-party beneficiary of contracts executed by the owner and Architect; (3) whether IHDA is subrogated to the owner's rights in its contract with Architect; (4) whether Architect and Goldstein owed IHDA a duty of care in the design and construction supervision of the development; and (5) whether Illinois law recognizes a cause of action in negligence to recover economic losses for professional malpractice.
We affirm with respect to IHDA, and we reverse and remand with respect to Schaumburg Green Associates and Chicago Title and Trust Company.
The Illinois Housing Development Act (Ill. Rev. Stat. 1979, ch. 67 1/2, par. 301 et seq.) declares that "there exists within Illinois a serious shortage, of decent, safe, and sanitary housing available at low and moderate rentals to persons and families of low and moderate income." (Ill. Rev. Stat. 1979, ch. 67 1/2, par. 303.) The Illinois Housing Development Authority was created as "a body politic and corporate with power to issue notes and bonds in order to make loans for the construction and rehabilitation of housing and community facilities, acquire and develop land for large-scale planned developments and new communities and, as a means of encouraging home ownership, make loans to and purchase residential mortgages from private lending institutions." Ill. Rev. Stat. 1979, ch. 67 1/2, par. 303.
On March 16, 1972, IHDA agreed to loan to Chicago Title and Trust Company, as trustee, $6,895,000 for the construction of eight buildings containing 367 apartments to be located in Schaumburg, Illinois. Schaumburg Green Associates, an Illinois limited partnership, was the sole beneficiary under the trust. The loan was increased to $7,300,000 on April 11, 1975, and to $7,977,000 on October 18, 1978. *132 Several documents were executed in connection with the loan, among them the construction contract, the owners-architect agreement for preconstruction services, and the owners-architect agreement for construction services. These three documents were executed on April 14, 1972.
The parties to the construction contract were the Chicago Title and Trust Company, the owner, and M-Z Construction Corp., the contractor. The contract itself defined "parties" as the owner and contractor, and "Authority" as the Illinois Housing Development Authority.
The arbitration clause provided as follows:
"5. Arbitration:
(a) Between Parties
Parties agree that all disputes between them concerning matters arising out of the Contract and any other matters directly or indirectly concerning the Development and Work shall be arbitrated and decided by the Authority pursuant to the Uniform Arbitration Act (Chapter 10, Section 101 et seq., Illinois Revised Statutes). Parties, either jointly or individually, shall promptly notify Authority in writing of a dispute setting forth the alleged facts and issues. Parties shall cooperate with Authority to aid its decision making. A reasonable time after receipt of the foregoing writing, Authority shall conduct a hearing and thereafter render a binding written decision. No dispute shall be considered or decided if it is not submitted by a Party within six months after the Completion Date listed in Contract Document 1 or any authorized extension thereof.
(b) Concerning Authority's Rights and Obligations
Parties and Authority agree that any disputes between them concerning Authority's rights including, but not limited to, those under Section 27 hereof and obligations arising out of the Contract shall be decided and arbitrated pursuant to the Uniform Arbitration Act (Chapter 10, Section 101 et seq. Illinois Revised Statutes) in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association, effective March 8, 1966, which are by reference incorporated herein. The arbitration proceedings shall take place in Chicago, Illinois."
The remedies clause of the construction contract provided as follows:

*133 "23. Remedies:
Authority's and Owner's remedies are cumulative and the exercise of one shall not be deemed an election of remedies nor foreclose the exercise of Authority's or Owner's other remedies."
The parties to the owners-architect agreement for preconstruction services were the Chicago Title and Trust Company, as owner, and Seymour S. Goldstein, Ltd., architect. The agreement provided in pertinent part as follows:
"4. Work
(a) Professional Services
The Architect will supply all professional services, including but not limited to architectural, engineering, consulting and, field engineering, necessary for the architectural planning and designing of Development, including but not limited to architectural planning, site planning, structural engineering, mechanical and electrical engineering, civil engineering, landscape architecture, and other services required for the complete performance of this Agreement (hereinafter called `Work'), provided however, that no portion of the Work may be delegated to any person or entity not acceptable to Owner and Authority.
(b) Responsibility
Architect shall be responsible for the Work and payment of any persons or entities performing services which are incorporated in the work hereunder.
(c) Standard of Performance
The Work performed hereunder by Architect shall be of the highest professional standards.
* * *
(e) Specific Work Requirements
Without limiting the scope of the Work set forth in (a) above, Architect shall specifically:
* * *
(v) order a subsurface soil investigation required for proper planning of Development, including the design of foundations, surface improvements, and underground piping and distribution systems.
* * *
(vii) make such changes in the documents due to deficiencies for which he is responsible.
(viii) furnish the following:
outline specifications *134 floor plans (full scale and suitable for advertising reproductions)
architectural planning
elevations
sections
complete architectural working drawings
complete specifications
land and site planning including layouts of parking areas, planting areas, sidewalks, grades, earth sculpture, building locations, building grades, exterior lighting, storm water retention, curbs, carriage walks, refuse storage areas, swimming pool area, utilities (water, gas, electric, sewer) etc.
civil engineering and drawings for the Development including water distribution and storm and sanitary sewer collection
structural engineering and drawings mechanical and electrical engineering and drawings."
The parties to the owners-architect agreement for construction services were also the Chicago Title and Trust Company, as owner, and Seymour S. Goldstein, Ltd., as architect. The agreement provided in pertinent part as follows:
"WHEREAS, Owner and Seymour S. Goldstein, Ltd. entered into an agreement dated April 14, 1972 for preconstruction service * * *; and
WHEREAS, Owner and M-Z Construction Corp. (hereinafter called `Contractor') entered into an agreement dated April 14, 1972 for the construction of Development (hereinafter called `Construction Contract') * * *.
* * *
NOW, THEREFORE, the parties agree as follows:
* * *
6. Work
(a) Professional Services
The Architect shall supply all professional services, including but not limited to architectural, engineering, consulting, field engineering, necessary for the supervision of the construction and completion of Development in accordance with the Work, as defined in the Preconstruction Architectural Agreement and the Construction Contract (but Architect is not a guarantor of Contractor's Obligations thereunder) and other services required for the complete performance of this Agreement (herein called `Work'); provided, however, that no portion of the Work *135 may be delegated to any person or entity not acceptable to Owner and Authority.
(b) Responsibility
Architect shall be responsible for the Work and payment of any persons or entities performing services which are incorporated in the Work.
(c) Standard
The Work performed hereunder by Architect shall be of the highest professional standards.
* * *
(e) Specific Work Requirements
Without limiting the scope of the Work set forth in (a) above, Architect shall specifically:
(i) Review all drawings and specifications, including shop drawings for completeness and adequacy and promptly give written notice to Owner and Authority of any inadequacies and inconsistencies, make revisions or notations in the drawings and specifications made necessary by conditions in the field or corroborate Contractor's field dimensions as necessary.
* * *
(iv) Make periodic visits, as many times as Owner or Authority shall request, to the construction site of Development and promptly report in writing to Owner and Authority on progress, problems and deficiencies observed in the Work, but such visits shall be not less than weekly for the duration of the active construction period. In addition, Architect shall be present at the Construction site when the following are performed: Setting lines and basic levels; completion of excavation; erecting forms and reinforcing, pouring of concrete and setting openings, sleeves, inserts; work of mechanical trades; before work of mechanical trades is covered up with walls and partitions; installation of utilities service entries, testing and use; installation of machinery and equipment, testing and use."
On September 26, 1979, the Illinois Housing Development Authority and Schaumburg Green Associates (Partnership) filed a complaint against the contractor M-Z Construction Corp., Seymour L. Goldstein, individually and as architect, M. Myers Associates, Inc., and Marvin B. Myers. Amended complaints were subsequently filed. The fifth amended complaint is the subject of this appeal. Plaintiffs in that complaint are IHDA, Partnership, and Chicago Title and Trust Company (Trustee). Defendants are the Contractor, Architect, Goldstein, M. Myers Associates, Marvin M. Myers, and numerous subcontractors.
*136 The fifth amended complaint alleged that IHDA has disbursed $7,977,000 for construction of the development, that the completion date was January 28, 1975, and that IHDA has performed all terms and conditions necessary under agreements executed in connection with the construction loan.
Count I of the complaint was brought against Architect under the owner-architect agreement for preconstruction services. IHDA alleged that it was a direct beneficiary of this agreement. It charged that Architect had breached the agreement in the following respects: failure to design roofs, landscape, plumbing and sewer lines, wooden balconies and exterior lighting in accordance with the highest professional standards; failure to order a subsurface soil investigation; failure to select and design the mechanical equipment in accordance with the highest professional standards; failure to supply the proper elevations, land and site planning drawings, civil engineering drawings, mechanical and electrical engineering drawings; and failure to design the window ledges so that they slope away from the buildings.
Plaintiffs alleged that as a result of these breaches, the roofs completely deteriorated and had to be replaced; the development experienced continual flooding and water leakage problems; the wooden balconies rotted and had to be replaced; and the mechanical equipment experienced frequent breakdowns and required frequent replacement.
Plaintiffs further claimed that Trustee and Partnership expended funds for repair, lost revenue, and incurred excess costs; and the development experienced general deterioration, causing a substantial impairment of IHDA's security interest. Plaintiffs asked damages of $1,900,000 plus costs.
Count II was brought against Architect under the owners-architect agreement for construction supervision. Plaintiffs alleged the following breaches by Architect: failure to review plans and specifications to determine their adequacy; failure to properly observe the work and inform IHDA of any deficiencies; failure to require the proper tests; and failure to check the surveyed lines and grades of building foundations, grades, and underground utilities.
Count III was brought against Goldstein under a negligence theory. Goldstein personally prepared plans and specifications and supervised the construction of the development. Plaintiffs claimed Goldstein performed the negligent acts alleged in counts I and II. In counts II and III, plaintiffs reiterated the injuries alleged in count I and asked the same amount of damages.
A hearing on the motion to dismiss counts I, II and III of the fifth *137 amended complaint began on April 6, 1981. After argument, the trial court stated:
"The Court finds specifically that the action brought is subject to the arbitration requirements, was not timely brought, that there is not a third-party beneficiary status to be considered here, that the 98-percent funding, accepting that figure, is not a reason to allow these counts to stand, and that the Resnik case is not controlling because of the difference between the State being a user in the Resnik case and not being one here."
The court also found that Goldstein had no tort duty to the IHDA and that a suit for economic loss was barred under Album Graphics, Inc. v. Beatrice Foods Co. (1980), 87 Ill. App.3d 338, 408 N.E.2d 1041. The order dismissing counts I, II and III was entered on May 27, 1981. Plaintiffs appeal.
The first issue we shall consider is whether IHDA has standing to sue Architect and Goldstein. IHDA advances several theories for bringing suit against these defendants: (1) that it is a third-party beneficiary of the two contracts executed between the owner and Architect; (2) that it is subrogated to the owner's rights in those contracts; (3) that the Architect and Goldstein owed it a duty of care in the design and construction supervision of the development; and (4) that Illinois law recognizes a cause of action in negligence to recover economic losses for professional malpractice.

Third-party beneficiary theory
In counts I and II of the fifth amended complaint, IHDA alleged that it is a direct beneficiary of the owners-architect agreement for preconstruction services and the owners-architect agreement for construction supervision. The parties to these agreements are Chicago Title and Trust Company, as owner, and Architect. In support of its argument that it is a third-party beneficiary of these contracts, IHDA explained its position as mortgagee.

IHDA as mortgagee
IHDA makes "assisted mortgages" to fulfill its statutory purpose of making "decent, safe, and sanitary housing available at low and moderate rentals to persons and families of low and moderate income." (Ill. Rev. Stat. 1979, ch. 67 1/2, par. 303.) It issues revenue bonds, the proceeds of which are used to finance mortgages of its developments. IHDA receives no tax funds, and its bonds are not backed by the credit of the State of Illinois. Bonds are repaid from income of the development and, in the absence of such income, from *138 assets of IHDA. A regulatory agreement between IHDA and the owner restricts the use of the development's income and the owner's economic return and governs the types of eligible tenants. To make sure that developments are not converted to nonsubsidized housing, IHDA, as mortgagee, prevents prepayment of the mortgage for 20 years.
IHDA argues that it is not the normal bank or savings and loan mortgagee for the following reasons: (1) IHDA provides mortgage funds solely in furtherance of its statutory purpose. (2) Its loans are thin-equity loans. In the instant case, the owner's cash investment at the initial loan closing was $129,588, whereas the loan was $6,895,000. (3) Its loans are long-term and cannot be prepaid in order to assure that IHDA's social purpose is carried out. (4) The mortgage and mortgage note are signed by a trustee, and for tax reasons must also be nonrecourse with respect to the beneficial owners. (5) There is often an identity of economic interest between the beneficial owner of the development and the general contractor or architect. IHDA claims that in the instant case there was an identity of interest between the beneficial owner and the general contractor which was severed after completion of construction when there was a substitution of Schaumburg Green Associates.
IHDA contends that these factors make a well constructed development essential. Improper construction not only frustrates its statutory purpose of providing decent housing but also may lessen income received from the development to pay off revenue bonds, thus threatening IHDA's ultimate security in the event of a future financial default. IHDA argues that it has injected itself into the construction process by making itself a third-party beneficiary of contracts with the general contractor and the architect.
 1 IHDA cites Altevogt v. Brinkoetter (1981), 85 Ill.2d 44, 421 N.E.2d 182, and People ex rel. Resnik v. Curtis & Davis, Architects & Planners, Inc. (1980), 78 Ill.2d 381, 400 N.E.2d 918, as authority for the proposition that it is a third-party beneficiary of contracts with Architect. In Altevogt, our supreme court stated that "a third party is a direct rather than an incidental beneficiary only if the contracting parties have manifested in their contract an intention to confer a benefit upon the third party." (85 Ill.2d 44, 54.) "[I]f the purchaser predicates his suit upon his status as a third-party beneficiary of the contract, he must allege facts which show an intent on the part of the developer to confer the benefit, which normally would be expressed in the agreement between the promisor and promisee." 85 Ill.2d 44, 56.

*139 Resnik

In People ex rel. Resnik v. Curtis & Davis, Architects & Planners, Inc. (1980), 78 Ill.2d 381, 400 N.E.2d 918, the State of Illinois brought an action for breach of contract against architects and contractors. In 1966, the Illinois Building Authority (IBA) and joint venturers Curtis & Davis Partnership and Samuel E. Sanner & Associates entered into a contract for services related to the construction of the Vienna Correctional Center. The circuit court dismissed the amended complaint, holding that the State was not a proper party. The appellate court reversed, holding that the State was a third-party beneficiary. On appeal to the supreme court, an issue was whether the State was a proper party. Our supreme court held that the State was a third-party beneficiary of the contract properly bringing suit in that capacity. (78 Ill.2d 381, 384.) The court examined provisions of the contract and found that the parties intended the State to be more than an incidental beneficiary or a mere tenant, stating:
"Section I(A)(1) provides that `Associate' (C & D Partnership) must consult with the `User' as well as `Owner' (IBA) `to ascertain the requirements of Project.' In section I(A)(3), the `Associate' must `revise the drawings, specifications and estimate in manner satisfactory to Owner and User.' Section IV(B) states that `Associate warrants and represents that it is free to enter into and fully perform this agreement, and that it has the right to grant the rights herein granted to Owner and User.' In section IV(D)(1), `Associate hereby indemnifies and holds harmless Owner, User * * *.' Finally, in addition to the signatures of the representatives of IBA and the joint venturers (Samuel E. Sanner & Associates and `Curtis & Davis'), a representative of `User/Supv. A & E' (supervising architect) has affixed his signature. (These are only some of the examples of the contract's reference to User, i.e., the State.)
The contract demonstrates that the parties  certainly the promisee, IBA [citations]  intended the State or `User' to be more than an incidental beneficiary or a mere tenant [citation]. Moreover, the surrounding circumstances [citations] show this intention. Construction of the prison would directly benefit the State, the `User'  not the parties; the State possessed the expertise, not IBA, necessary for the construction characteristics of a prison. The IBA and the State agreed to a construction lease for the Vienna facility in 1965. And the relationship between the State and IBA was an ongoing one which was dictated, in 1966, by the limitation placed on the State's budget *140 deficit by the 1870 Constitution. IBA was the mechanism formed by the General Assembly to circumvent this limitation. Yet, we repeat that it is the contract which is controlling and is persuasive here; and on that basis we limit our holding: the State is a proper party plaintiff because it is a direct beneficiary clearly identified and intended in the contract before us." 78 Ill.2d 381, 386-87.

The architectural agreements
IHDA compares provisions of the preconstruction services contract in the instant case with similar provisions of the contract cited by the supreme court in Resnik. According to IHDA, its rights are nearly as great as the owner's rights. IHDA shares ownership of the work. Decisions such as payment, delegation of work, and assignment and modification of the contract can only be made with IHDA and the owner's joint approval. Decisions such as Architect's attendance at conferences, what drawings should be prepared and what changes should be made in plans and specifications can be made irrespective of the owner's wishes. Finally, professional liability insurance which the Architect must obtain need only insure IHDA.
IHDA also compares the construction supervision contract with the Resnik contract. According to IHDA, its rights were at least as great as those of the owner. IHDA had a greater interest in ownership of the work  it had at least equal ownership and under some circumstances owned the work exclusive of both contracting parties. It could terminate the contract regardless of the owner's wishes, but the owner could terminate only with IHDA approval. IHDA's greater interest was also shown through Architect's duties. Architect owed to IHDA and the owner such duties as notice of illegality or inadequacy of design, submission of weekly reports, recommendations of changes and maintenance of professional liability insurance. The duty of post-construction inspection was owed only to IHDA. Duties such as making visits, attending conferences, and whether to do such things as did not substantially alter the contract, could be made by IHDA independently of the owner. Finally, modification and assignment of the agreement required IHDA and the owner's joint approval.
IHDA concludes that these provisions in both contracts show an intent to confer a direct benefit upon it, and that therefore, it is a third-party beneficiary of the architectural agreements. We disagree.

Sjostrom
This contention was rejected by the appellate court in Illinois *141 Housing Development Authority v. Sjostrom & Sons, Inc. (1982), 105 Ill. App.3d 247, 433 N.E.2d 1350. In Sjostrom, IHDA appealed the dismissal of its 13-count complaint against various defendants involved in a construction project for which it was mortgagee. The court stated:
"Although many provisions in the Resnik contract and the contracts at bar are similar, there is a significant difference in the role of the State in the Resnik contract and the role of the IHDA in the instant contracts. Under the Resnik contract, the party asserting third-party beneficiary status was to be the ultimate user of the structure. Here no such status exists. The IHDA is no more than a regulatory authority and a mortgagee.
A reading of the contracts in question indicates that as a mortgagee the IHDA was granted certain rights to supervise and to control specific aspects of the planning and construction of the development. The contract provisions which gave the IHDA these rights were apparently designed to insure that the development would be well built at the lowest possible cost, and that the opportunity for fraudulent business dealings and for the exercise of proof business judgment would be kept to a minimum. However, most, if not all, of these rights granted to the IHDA were to be exercised before and/or during the performance of the contract. Moreover, these rights are unrelated to the provisions with the IHDA presently asserts as breached.
The IHDA, nonetheless, concludes that because of its unique statutory role, the thin capitalization of the project and these other rights granted under the contract, they should be deemed a direct, third-party beneficiary to all of the provisions. However, under Carson Pirie Scott & Co. v. Parrett (1931), 346 Ill. 252, 258, the liability affirmatively arising from the contract language cannot be extended or enlarged on the sole ground that the situation and the circumstances demand further or other liability.
Here, unlike Resnik, the development is not being constructed to directly benefit the IHDA. The beneficial owner, Valley View, is the user; the IHDA is merely a mortgagee. In its entirety the contract directly benefits only the parties, and the contract provisions which the IHDA seeks to enforce only incidently [sic] and collaterally benefit the IHDA, as a mortgagee." 105 Ill. App.3d 247, 258-59.
 2 In accordance with Sjostrom, we hold that the trial court did not err in holding that IHDA was not a third-party beneficiary of the *142 architectural agreements.

Subrogation theory
 3 IHDA next contends that it is subrogated to the owner's rights under the architectural contracts, and cites National Cash Register Co. v. Unarco Industries, Inc. (7th Cir.1974), 490 F.2d 285, as authority. In that case, a building owner sued a subcontractor for breach of the subcontract to provide materials for a building. The court of appeals held that the building owner was a subrogee of the contractor's cause of action for breach of contract and had standing to sue. (490 F.2d 285, 287.) The doctrine of subrogation is designed to place the ultimate responsibility for a loss upon the one on whom in good conscience it ought to fall, and to reimburse the innocent party who is compelled to pay. (490 F.2d 285, 286.) Under this doctrine, a person who pursuant to a legal liability has paid for a loss or injury resulting from the negligence or wrongful act of another, will be subrogated to the rights of the injured person against such wrongdoer. (490 F.2d 285, 286.) In its fifth amended complaint, IHDA does not allege that under a legal obligation it has paid for the loss or injury incurred by the owner as a result of defendant's negligence or wrongful acts, nor does IHDA allege that it has paid the claim of the owner. (Illinois Housing Development Authority v. Sjostrom & Sons, Inc. (1982), 105 Ill. App.3d 247, 259, 433 N.E.2d 1350, 1359.) Therefore, we hold that IHDA is not a subrogee of the owner under the architectural agreement.

Negligence theory
IHDA argues that Architect and Goldstein owed it a duty of care in the design and construction supervision of the development. It asserts that under Rozny v. Marnul (1969), 43 Ill.2d 54, 250 N.E.2d 656, and Normoyle-Berg & Associates v. Village of Deer Creek (1976), 39 Ill. App.3d 744, 350 N.E.2d 559, the negligent performance of a contract can give rise to a tort action in favor of someone who could not sue for breach of contract. In Rozny, purchasers of a house were allowed to recover damages from a surveyor who had inaccurately surveyed the property. Our supreme court stated that the lack of a direct contractural relationship between the parties is not a defense in a tort action in Illinois. Tort liability is measured by the scope of the duty owed rather than artificial concepts of privity. 43 Ill.2d 54, 62.
In Normoyle-Berg & Associates v. Village of Deer Creek (1976), 39 Ill. App.3d 744, 350 N.E.2d 559, plaintiff alleged negligent supervision of a sewer project by defendant engineers. Plaintiff contended *143 that privity of contract was not required in order to impose a duty upon defendant engineers. The court agreed. It concluded that a supervising engineer owed a duty to a general contractor to avoid negligently causing extra expenses for the contractor in the completion of a construction project even in the absence of a direct contractual relationship. 39 Ill. App.3d 744, 746.
 4 IHDA's negligence theory was extensively discussed and rejected in Illinois Housing Development Authority v. Sjostrom & Sons, Inc. (1982), 105 Ill. App.3d 247, 433 N.E.2d 1350. The Sjostrom court stated that allowing direct action would give every holder of a security interest a right to bring a suit against one who negligently injures the secured property and would unduly multiply and complicate litigation. (105 Ill. App.3d 247, 262.) Therefore, in accordance with Sjostrom, we hold that defendants owed IHDA no duty of care in the design and construction supervision of the development.

Recovery of economic losses for professional malpractice theory
IHDA's final argument is that Illinois courts have allowed recovery for economic losses in professional malpractice cases and, thus, Architect is liable for economic damages caused by its professional negligence. It contends that the trial court erred in holding that the Album Graphics case barred its economic loss arguments.
In Album Graphics, Inc. v. Beatrice Foods Co. (1980), 87 Ill. App.3d 338, 408 N.E.2d 1041, plaintiff, Album Graphics, ordered glue for use in the assembly of newly designed cosmetic packages from defendant, Beatrice Foods Co. After plaintiff sold a number of the new cosmetic packages to its customer, they fell apart and plaintiff had to recall and remake the packages with a different glue. Plaintiff sought damages on four counts: counts I and II were based on contract; count III was based on negligence; and count IV on fraud. With regard to count III, the court defined the issue as whether a plaintiff can recover purely economic losses for the failure of a defendant to carefully perform duties imposed upon that defendant by a contract entered into between plaintiff and defendant. (87 Ill. App.3d 338, 349.) The court stated:
"Plaintiff should have his remedy for breach of contract, but he should not be allowed to recover under tort law that which he may or may not be entitled to recover under the contract or under contract law. Hence, we necessarily hold that plaintiff in this case has failed to state a cause of action in negligence to recover purely economic losses." 87 Ill. App.3d 338, 350.
 5 Album Graphics, Inc. is inapposite in the instant case because *144 there was no contractural relationship between IHDA and we have held above that IHDA may not sue in contract as a third-party beneficiary or subrogee. Therefore, the trial court was incorrect in holding that Album Graphics, Inc. barred IHDA's arguments of economic loss. Nevertheless, IHDA is precluded from suing defendants on a negligence theory because, as we have also stated above, defendants owed no duty of care to IHDA.
Therefore, we affirm that part of the trial court's order dismissing IHDA as a party.

Owners' cause of action
The final issue raised by this appeal is whether the parties to the architectural agreements are bound by the arbitration provision of the construction contract. The trial court held that the lawsuit by owners and IHDA was not timely brought against Architect and Goldstein because of that provision. Defendants argue that since the construction contract and the architectural agreements were signed on the same day they are to be construed together. According to defendants, the clear intent of the parties was to provide for arbitration to resolve any disputes concerning the agreements. We disagree.
In the interpretation of contracts, the courts cannot make a new contract by supplying provisions nor give plain and unambiguous language a distorted construction. (Whaley v. American National Insurance Co. (1975), 30 Ill. App.3d 32, 34, 331 N.E.2d 571, 572.) The construction contract provided that "[n]o dispute shall be considered or decided if it is not submitted by a Party within six months after the Completion Date * * *." "Party" is defined in that contract as owner, Chicago Title and Trust Company, and contractor, M-Z Construction Corp. There is no arbitration provision in either of the architectural agreements signed by the parties, Chicago Title and Trust Company and Architect. A "disputes" provision indicates that "[a]ny disputes concerning this Agreement shall be decided by Authority."
 6, 7 The owners-architect agreement for construction supervision provides as follows:
"WHEREAS, Owner and M-Z Construction Corp. * * * entered into an agreement dated April 14, 1972 for the construction of Development * * *, a copy of which has been furnished Architect and which is incorporated herein by reference.
* * *
NOW, THEREFORE, the parties agree * * *."
In our opinion, this provision is a recital, an explanation of the circumstances surrounding the execution of the contract. Preliminary recitals *145 of an agreement do not become binding obligations unless so referred to in the operative portion of the instrument as to show a design they should form a part of it. (Wall v. Chicago Park District (1941), 378 Ill. 81, 92, 37 N.E.2d 752, 757-58.) We find no evidence in the architectural agreements of an intent to incorporate into them the arbitration provision of the construction contract.
 8 Finally, we note that in a case similar to the instant case the court, while denying IHDA's standing, acknowledged owner's standing to sue. It remarked that the owner had sued most defendants named by IHDA, and, if successful, would have sufficient funds to make needed repairs. (Illinois Housing Development Authority v. Sjostrom & Sons, Inc. (1982), 105 Ill. App.3d 247, 260, 433 N.E.2d 1350, 1360.) Therefore, we hold that owners may sue Architect and Goldstein, and their suit is not barred by the 6-month limitation period in the arbitration provision of the construction contract.
For the foregoing reasons, we reverse and remand for further proceedings that part of the trial court's order dismissing for untimeliness owner's suit against Architect and Goldstein.
Affirmed in part, reversed and remanded in part for further proceedings.
JIGANTI and ROMITI, JJ., concur.