INLAND REAL ESTATE CORPORATION, Plaintiff-Appellant, v. TOWER CONSTRUCTION COMPANY *et al.*, Defendants (Rabin-LeNoble Associates *et al.*, Defendants-Appellees).

First District (2nd Division)   No. 87—1708

Opinion filed August 30, 1988.

Donald E. Egan, Lee Ann Watson, and James E. Hanlon, Jr., all of Katten, Muchin & Zavis, of Chicago, for appellant.

S. Joseph Formusa, of Rabens, Formusa & Glassman, Ltd., of Chicago, for appellees Weinper & Balaban, Inc., Howard Weinper, and Morton Balaban.

E. J. Garbutt, of Garbutt & Jacobson Associates, of Chicago, for appellee Rabin-LeNoble Associates.

JUSTICE SCARIANO delivered the opinion of the court:

Inland Real Estate Corporation (Inland), engaged in the business of real estate development, syndications, and property management, brought this action against the architects, builders and sellers of three apartment buildings which Inland purchased in the course of its business. It appeals from the circuit court's award in favor of the defendants-appellees (architects) of a section 2—615 of the Code of Civil Procedure motion to dismiss its suit (Ill. Rev. Stat. 1985, ch. 110, par. 2—615), the court having held that Inland had no standing to sue either in its own right or as subrogee.

In April 1971, La Salle National Bank of Chicago (La Salle), as trustee on behalf of its beneficiary, Century Towers Co. (Century), entered into a contract with Tower Construction Company (Tower) for the construction of the three buildings forming the subject matter of this action. During the same month La Salle, again as trustee, entered into an owner-architect agreement with the two architectural firms which are the appellees here, Rabin-LeNoble Associates and Weinper and Balaban, Inc., whereby they would provide architectural, engineering and consulting services in connection with the construction of the three buildings, designated A, B and C.

Tower commenced construction in May 1971. When building B began to experience settlement problems shortly after construction began, Tower and the architects discovered that the footings, foundations, and soil under the building could not support the structure; accordingly, they undertook measures to correct the problem. Although the buildings were certified by the architects in 1973 as substantially complete, building B continued to settle due to the nature of the underlying soil and the inadequacy of the corrective measures.

In August 1975, Inland purchased Century's entire beneficial interest in the land trust.[1] There is some dispute as to the substance of the discussions which took place between Inland and Century prior to the sale of the buildings. That dispute forms the basis of several other counts of Inland's suit against Century and Tower, which remain pending in the circuit court and are therefore not a part of this appeal.

Shortly after purchasing the property from Century, Inland formed two limited partnerships, Interlude I and Interlude II, in which it sold interests to public investors. Buildings B and C were sold to Interlude II on September 1, 1975, while building A was sold to Interlude I on December 31, 1975. In each transaction Inland sold its beneficial interest in the property to the appropriate Interlude partnership by installment contract, and it became a general partner in both Interlude I and Interlude II. Inland also entered into an agreement with each partnership whereby it undertook to manage the apartments. A provision of each management agreement, captioned *"Independent Contractor,"* states, "It is understood that in operating and managing the project, Manager is an independent contractor and is not acting as agent, partner, joint venturer, or lessee of Owner and nothing herein shall be construed as reserving to Owner the right to control Manager's business or operations or the manner in which the same shall be conducted."

In early 1977, Inland discovered settlement problems with respect to building B and paid in excess of $400,000 to investigate the problem and for necessary repairs. By September 1, 1977, settlement had progressed to the extent that an entire wing of the building had to be evacuated. In addition to the direct costs of correcting the settlement problem, Inland paid Interlude II approximately $270,000 to compensate for lost rents.

During January 1982, buildings A, B and C each suffered severe

---

[1]Although it appears that two land trusts are involved in this litigation, in order to simplify matters we shall treat all properties as covered by one such trust.

vertical cracking in their exterior masonry as well as rupturing of the internal structure of the buildings. Here again, Inland paid the cost of the repair work, which amounted to approximately $45,000.

After Inland filed its complaint on January 18, 1979, this case underwent a long and involved procedural odyssey in the trial court, a detailed history of which is not really germane to our resolution of the issues herein.

Until and including the filing of its seventh amended complaint on July 26, 1985,[2] Inland pleaded that it was the beneficial owner of the properties. On October 26, 1986, after its answers to certain interrogatories revealed that Inland had transferred its beneficial interest in the properties to Interlude I and Interlude II during the year 1975, the architects filed motions pursuant to section 2—619 of the Code of Civil Procedure (Ill. Rev. Stat. 1985, ch. 110, par. 2—619) to dismiss the tort actions against them contained in Inland's seventh amended complaint on the ground that it did not have legal capacity to sue for and recover the damages prayed for in the complaint. The court granted the motions and gave leave once more to Inland to amend its complaint.

In its eighth amended complaint, filed on January 6, 1987, Inland asserted, as it had in all of its previous complaints, that La Salle as trustee held legal title to the properties involved in this suit, but on this occasion it abandoned the pleading of any ownership claim in itself. In this latest and last complaint Inland also advanced for the first time a theory of recovery based on subrogation. The architects filed a motion pursuant to section 2—615 of the Code of Civil Procedure (Ill. Rev. Stat. 1985, ch. 110, par. 2—615) to strike and dismiss based on the grounds that Inland had no standing to sue inasmuch as it was not the owner of the buildings when the damage occurred and that Inland had no right of subrogation under the facts alleged.

On April 15, 1987, the trial court ruled that Inland had no standing to sue the architects either in its own right or as subrogee. The order and resultant appeal apply to the counts of the eighth amended complaint that pertain only to the architects.

This timely appeal followed.

## I

It is uncontested that Inland paid out approximately $700,000 as a

---

[2]At an early stage of this litigation La Salle was dismissed as a party plaintiff on motion of the defendants, the trial court having held that as land trustee it was not a real party in interest.

result of the settlement and masonry damage to the apartment buildings. Accordingly, the first issue we consider is whether the trial court erred in ruling that Inland lacked standing in its own right to sue the architects for negligence.

■ A well-accepted definition of the standing concept is to be found in *Lynch v. Devine* (1977), 45 Ill. App. 3d 743, 359 N.E.2d 1137:

"The doctrine of standing, simply stated, requires that a party seeking relief from the courts must allege some injury in fact to some substantive, legally-protected interest of his, which is a right or interest either recognized by common law or created by statute. (See 59 Am. Jur. 2d *Parties* §§26-29 (1971).) The doctrine is used to insure that the courts are available to decide actual, specific controversies between the parties and are not overwhelmed in the mire of abstract questions, moot issues, or cases brought on behalf of other parties who do not desire judicial aid." (45 Ill. App. 3d at 747-48.)

(Accord *Weihl v. Dixon* (1977), 56 Ill. App. 3d 251, 371 N.E.2d 881.) The determinative question, therefore, is whether, for the purposes of this suit, Inland has a legally protected interest in the apartment buildings.

Inland explains in its brief filed in this court that "[b]ecause the Limited Partnerships purchased the Interlude apartments pursuant to installment contracts, Inland retained legal title to the properties pending complete performance of the installment contracts. Thus, when Inland commenced the litigation in 1979, the legal title had not yet been conveyed to the Limited Partnerships and Inland was still listed as the beneficial owner of the land trusts that held title to the properties. Subsequently, in 1980 and in 1983, each of the Limited Partnerships sold the Interlude properties, and neither Inland nor the Limited Partnerships retained an ownership interest in the Interlude apartments. Accordingly, Inland's original complaint alleged that Inland was the present owner of the beneficial interest of the land trusts." Inland goes on to explain that its inclusion of a beneficial ownership claim in subsequent complaints was due to inadvertence.

Because Inland included this passage in its brief merely as "Background to Standing Issues," but more especially because it had abandoned any claim to ownership, legal or equitable, during any period pertinent to this litigation, we, of course, need not consider or discuss Inland's legal conclusion that it retained title of any kind "pending complete performance of the installment contracts."

No longer claiming any ownership interest in the property, Inland

ultimately maintained in the trial court and continues to assert here that since it was the owner of the buildings prior to syndicating the Limited Partnerships and transferring its interest, it is "within the zone of persons" entitled to a protectable interest therein. The architects contend that since Inland was neither an owner, occupier nor user of the property when the damage occurred it has no legal interest to protect.

Inland cites *Laukkanen v. Jewel Tea Co.* (1966), 78 Ill. App. 2d 153, 222 N.E.2d 584, for the proposition that as a foreseeable "owner, occupier, or user," it was owed a duty by the architects. *Laukkanen* was an action for damages suffered by a plaintiff who was injured when a building designed by the defendant engineers collapsed during a violent windstorm. In that case the court ruled "that the defendants owe a duty to respond in damages to those members of the general public who can be reasonably anticipated to be present in the structure." (78 Ill. App. 2d at 161.) We perceive no similarities in the two cases. *Laukkanen* involved personal injury to a member of the general public; neither element is present in the instant case.

Inland insists, however, that the fact that it was not the owner of the buildings at the time they were damaged does not deprive it of standing, citing *Zepeda v. Zepeda* (1963), 41 Ill. App. 2d 240, 190 N.E.2d 849, *cert. denied* (1964), 379 U.S. 945, 13 L. Ed. 2d 545, 85 S. Ct. 444, a case in which an infant sought damages from his father because he was born an illegitimate child, for the proposition that it makes no difference how much time elapses between the wrongful act and the resulting injury. But we find *Zepeda* to be inapposite for the reason that it was a personal injury action and the court's statement regarding lapse of time related only to its discussion of the issue of proximate cause. The issue in this case is plainly lack of standing rather than proximate cause; moreover, it goes without saying that standing is the *sine qua non* to reaching proximate cause or any other substantive issue.

Inland further argues that the circumstances in this case are analogous to *Wolinsky v. Kadison* (1983), 114 Ill. App. 3d 527, 449 N.E.2d 151, and *Commonwealth Edison Co. v. Community Unit School District No. 200* (1976), 44 Ill. App. 3d 665, 358 N.E.2d 688. In *Wolinsky*, a potential purchaser of a condominium brought an action against the condominium association and its board of directors because the association exercised its right of first refusal thus preventing her purchase of a unit. The defendant association argued that the plaintiff lacked standing to assert a claim of unreasonable restraint on alienation since the action of the association affected only the rights of the

owner to sell that unit and that as a prospective purchaser, the plaintiff had no interest. (*Wolinsky*, 114 Ill. App. 3d at 530.) The court disagreed, explaining as follows:

"The standing doctrine is not meant to preclude a valid controversy from being litigated, but rather, to preclude persons having no interest in the controversy from bringing suit. *** Where the person most directly affected actually has no interest in the controversy, courts have been more liberal in allowing persons indirectly affected to bring suit." 114 Ill. App. 3d at 530-31.

In *Commonwealth Edison*, a school district filed a declaratory judgment action challenging the constitutionality of a utilities tax which the plaintiff passed on to its customers. The company's standing to challenge the tax was contested by the defendant. The court upheld the school district's standing, noting that it is not necessary that a party be the initial taxpayer for the reason that "the utilities directly affected as the initial taxpayer can be said to have no real interest in the controversy since the charge is added to the users' bills." *Commonwealth Edison Co.*, 44 Ill. App. 3d at 670.

Inland argues that the conclusions reached in *Wolinsky* and *Commonwealth Edison* apply to the instant case in that Inland, like Wolinsky and the school district, was the party most directly affected by the architects' action, thus giving Inland standing to sue. Inland maintains that although the settlement damage occurred while the partnerships owned the apartments, they had no real interest in litigating the controversy since Inland bore the economic impact of the damage. It is not surprising, however, that the partnerships had no real interest in bringing suit given that Inland removed whatever incentive those entities may have had by paying for the damages itself. But by the mere act of such payment, Inland could not confer upon itself any legal interest capable of commanding the judicial recognition or protection it seeks here. The legally recognized interest of the partnerships may not be rendered defeasible or deemed to be relinquished, however amicable or even familial the relationship between the parties, by Inland's voluntary assumption of the payment of damages which the record nowhere discloses to be Inland's obligation.

■ Indeed, the contrary appears to be the case, for although Inland's management agreements with the partnerships make it a duty of Inland as the manager to "[m]ake or cause to be made all repairs, reconstruction, replacements, and adjustments required to be made," each agreement specifically provides that "[u]ntil December 31, 2005 expenditures on behalf of the project shall be made first from cash in-

come and if insufficient, shall be made by the owner," that is, the partnership in each case. These same agreements, we note, provide Inland with the authority "in its sole discretion" to make loans to the partnerships and to take assignments or other security as it alone could determine, thereby assuring itself of the capability by every appropriate means to recover any funds it expended to make repairs. Inland obviously declined to exercise any such authority; accordingly, however admirable its decision, Inland cannot be heard to contend here that such declination cloaks it with standing in this case. It is clear also that Inland sues only in its own name and not on behalf of the Interlude entities. And nowhere does Inland assert that it had a security interest which was impaired, if, indeed, there has been any such impairment.

The architects cite *Weihl v. Dixon* (1977), 56 Ill. App. 3d 251, 371 N.E.2d 881, in support of their position. In *Weihl* an attorney sued the Illinois Secretary of State in an action seeking a declaration that a single-shareholder corporation, permitted under Illinois law, need not engage another person to serve as secretary. The circuit court dismissed the action on the ground that the attorney lacked standing to sue, despite his contention that he had many single-shareholder corporate clients and that he should be allowed to file annual reports on their behalf without the designation of another person as secretary, as to which the trial court stated:

> "The person seeking to invoke the jurisdiction of the court must have some real interest in the cause of action, or a legal or equitable right, title or interest in the subject matter of the controversy. ***
>
> *** Moreover, that the instant action involves questions directly affecting the interests of plaintiff's clients can give him no more right, title or interest in the subject matter of the controversy than a physician would have to the body of his patient. No annual report of plaintiff's was refused by defendant but only those of plaintiff's clients. It is they whose rights were allegedly infringed and thus it is they who must seek redress. Plaintiff may not invoke a remedy on behalf of others who do not seek or desire it. Consequently we find plaintiff lacks standing to bring the instant action." 56 Ill. App. 3d at 253-55.

Managing the apartments as an independent contractor under agreements that conferred no ownership interest upon it, Inland had the authority to act only in a management capacity. Nothing in those agreements gives it standing in its own right to sue for damages to the partnerships' interests, and Inland does not so contend. In any

event, as *Weihl* amply demonstrates, no amount or degree of attornment supplies a party with the standing necessary to maintain the type of action we have at bar. In sum, we decline to hold that standing, like the goddess Athena, of Greek mythology, springs, fully mature and in complete armor, from the brow of Zeus.

## II

The remaining issue is whether the trial judge erred in ruling that Inland lacked standing as subrogee in order to sue the architects for negligence.

"Subrogation has been defined as the substitution of another person in the place of a claimant to whose rights he succeeds in relation to the debt or claim asserted which has been paid by him involuntarily. [Citation.] The doctrine of subrogation is broad enough to include every instance in which one person, not a mere volunteer, pays a debt for which another is primarily liable and which in equity and good conscience should have been discharged by the latter. [Citation.] The right of subrogation for payment by an innocent party exists as a matter of law and independent of contract ***." *Bost v. Paulson's Enterprises, Inc.* (1976), 36 Ill. App. 3d 135, 139, 343 N.E.2d 168.

■■ The Illinois Supreme Court has discussed the essential elements of the doctrine of subrogation as follows:

"This legal concept originated in equity, but is presently an integral part of the common law, and is designed to place the ultimate responsibility for a loss upon the one on whom in good conscience it ought to fall, and to reimburse the innocent party who is compelled to pay. Under this doctrine, a person who, pursuant to a legal liability, has paid for a loss or injury resulting from the negligence or wrongful act of another, will be subrogated to the rights of the injured person against such wrongdoer." *Geneva Construction Co. v. Martin Transfer & Storage Co.* (1954), 4 Ill. 2d 273, 283, 122 N.E.2d 540.

Nevertheless, Inland cites a case of our United States Court of Appeals for the principle that it is not necessary to be under an absolute or unconditional "legal" obligation to pay in order for subrogation to apply. In that case the court explained:

"One can be subrogated to the rights of another even if the debt in question is not paid pursuant to an unconditional or fully choate requirement of law, such as might be represented by a provision of a binding contract or by a final judgment. Both the Illinois courts and federal courts applying Illinois law

have not required for subrogation compulsion similar to that of a final judgment or of an enforceable contract; rather, the *potential* for legal liability to the subrogor, as well as the disruption of normal relations and the frustration of reasonable expectations can, in many cases, supply sufficient compulsion to support subrogation." (Emphasis in original.) (*American National Bank & Trust Co. v. Weyerhaeuser Co.* (7th Cir. 1982), 692 F.2d 455, 463.)

Inland fails to note, however, that in *Weyerhaeuser* the court found that an agency relationship existed, and, as a result, there was a legal obligation to pay. Consequently, *Weyerhaeuser* is too distant a fire to give Inland any warmth in this case.

To substantiate its assertion that it had potential liability if it had not paid the costs of repair and reimbursed Interlude for lost rents, Inland points to its "Offering Memorandum" in syndicating the partnerships which states that in situations where Inland had previously sold interests in limited partnerships and the cash flow was not as projected, Inland had contributed or loaned money to the partnership. However, the memorandum also states that "The Partnership's operations will be subject to the risks generally incident to the ownership of real property including *** changes in *** operating expenses *** and other factors which are beyond the control of the General Partner." The memorandum also goes on to warn the potential investor that "if the cash flow of the Partnership is insufficient to service the debt incurred by the Partnership, the Partnership's equity could be reduced or eliminated through foreclosure." Accordingly, we fail to observe that the "Offering Memorandum" affords Inland any support in law or in reason for its assertion.

Inland further cites a section of the limited partnership agreements to illustrate that it was fulfilling its contractual and fiduciary obligations when it made payments on behalf of the limited partnerships. That section states:

"To the extent that the Limited Partners do not receive annual net cash receipts for 1976 equal to 4%, 1977 equal to 6%, and for any calendar year beginning in 1978 equal to 8% of their capital contributions as reduced by any return of original invested capital as set forth in this Article 9, the General Partners shall, in order to discharge their obligations hereunder, contribute to the capital of the Partnership on behalf of the Limited Partners their Incentive Fee set forth in Section 9.2, plus an amount equal to 50% of the Corporate General Partner's Property Management Fee received during such calendar

year to the extent necessary to give the Limited Partners such annual net cash receipts."

This section clearly sets a limit on Inland's responsibility to the limited partners as does another provision of the agreements, which states that 98% of the losses of the Partnerships from operations be allocated to the limited partners and the remaining 2% to the general partners. Moreover, the limited partnership agreements provide that Inland "shall not be liable, responsible or accountable in damages or otherwise to the partnership or any limited partner for any action taken or failure to act on behalf of the partnership." Therefore, it would appear that rather than create a potential legal liability for Inland, these documents actually serve to insulate Inland therefrom.

It is worthwhile repeating here that although the limited partnership agreements provided Inland with the power, "in its sole discretion," to make loans to the partnerships and to take assignments or any other security as it alone could determine, thereby assuring itself of the ability to recover funds expended to make repairs, in the instant case Inland chose not to avail itself of these measures. However commendable its motives for making that choice may be, Inland cannot successfully maintain here that such forbearance confers upon it the status of a subrogee.

The architects cite two relatively recent appellate court opinions which discuss the right of recovery under subrogation principles. In the first cast, *Illinois Housing Development Authority v. Sjostrom & Sons, Inc.* (1982), 105 Ill. App. 3d 247, 433 N.E.2d 1350, IHDA loaned money to a developer who was the beneficial owner of property upon which an apartment building project was erected pursuant to construction and architectural service contracts entered into by the developer with the general contractor and two firms of architects that designed and supervised the construction. Shortly after completion of the building, extensive structural deficiencies were discovered. Quoting from *Lynch v. Devine*, which we have cited in an earlier portion of this opinion, the court held that IHDA, as mortgagee, did not have such a "personal or property right" to recover the repair expenses.

In the second case, *Illinois Housing Authority v. M-Z Construction Corp.* (1982), 110 Ill. App. 3d 129, 441 N.E.2d 1179, the court dismissed a claim by IHDA, brought under the doctrine of subrogation, for the costs of repairing extensive structural damage to an apartment complex upon which IHDA had made a mortgage loan. In its opinion, the court stressed once more the necessity for a legal liability to exist in order to invoke the subrogation doctrine.

As Inland correctly points out, in both *Sjostrom* and *M-Z Con-*

*struction* the court found that IHDA had not alleged that it had paid for the loss or injury incurred by the owner as required under the doctrine of subrogation. However, in the instant case, although Inland has alleged that it actually paid the repair expense, it does not claim that it paid the expenses pursuant to a legal obligation as was required in both the cited cases.

We revert to *Weyerhaeuser*: "A final, and crucial, requirement for exercising the right of subrogation, \* \* \* is that the potential subrogee must not have acted as a 'volunteer' in paying a claim of the subrogor properly lying against a third party." (*American National Bank & Trust Co. v. Weyerhaeuser Co.* (7th Cir. 1982), 692 F.2d 455, 463.) The court quoted with approval from *Ohio National Life Insurance Co. v. Board of Education* (1944), 387 Ill. 159, 55 N.E.2d 163, *cert. denied* (1945), 323 U.S. 796, 89 L. Ed. 635, 65 S. Ct. 439 as follows:

> "In the *Chandler* case it was said that 'a stranger within the meaning of this rule is not necessarily one who has had nothing to do with the transaction out of which the debt grew. Anyone, who is under no legal obligation or liability to pay the debt, is a stranger, and, if he pays the debt, a mere volunteer.' " 387 Ill. at 178.

■ Inland alleges that its payments were made "in accordance with contractual and fiduciary obligations" and to avoid taking measures that "were unacceptable to Inland for business reasons in order to maintain its reputation of integrity as a promoter and seller of real estate limited partnerships." However, we find it necessary to reiterate here that the limited partnership agreements provided Inland with not only the exclusive authority to manage the operations of the partnerships, but also the right in its sole judgment to borrow money on behalf of the partnerships or other option to lend money to them and to take assignments. Inland points to no legal duty to absorb the cost of the repairs. Indeed, as we have noted above, although Inland's management agreements with the partnerships make it a duty of Inland as the manager to "[m]ake or cause to be made all repairs, reconstruction, replacements and adjustments required to be made," each agreement clearly provides that "expenditures on behalf of the project shall be made first from cash income and if insufficient, shall be made by the owner," namely, the partnership in each case.

■ This case was decided by the trial court on the architects' motion to dismiss pursuant to section 2—615 of our Code of Civil Procedure. (Ill. Rev. Stat. 1985, ch. 110, par. 2—615.) All of the documents to which we have referred herein were appended to the plaintiff's complaint as a part thereof, and we have carefully examined all 219

pages of those exhibits. This court discussed the guidelines to be used in considering a section 2—615 motion in *Claire Associates v. Pontikes* as follows:

"A motion to dismiss a complaint for failure to state a cause of action attacks the legal sufficiency, as opposed to the factual sufficiency, of a complaint. [Citation.] The facts pleaded in the complaint are significant only insofar as they are necessary to state the elements of a claim upon which relief may be granted. A plaintiff is not required to prove his case in the pleading stage; rather, he must merely allege sufficient facts to state all the elements which are necessary to constitute his cause of action ***. It is only where no state of facts proved under the pleading would entitle plaintiff to recovery that a motion to dismiss should be granted under section 2—615. [Citation.] In sum, it is not enough merely to inform the defendant of the nature of the claim; the pleading must also provide a factual premise underlying the claim." *Claire Associates v. Pontikes* (1986), 151 Ill. App. 3d 116, 123, 502 N.E.2d 1186.

■ We affirm the circuit court's holding that Inland lacks standing to bring this action either in its own right or as subrogee, for in light of the record before us we can conceive of no state of facts that can be pleaded which would entitle Inland to recovery in this matter.

In view of the disposition we make of this case, we do not need to rule on the motion of Inland to strike certain portions of the brief of the architects having to do with principles enunciated in *Moorman Manufacturing Co. v. National Tank Co.* (1982), 91 Ill. 2d 69, 435 N.E.2d 443. Nor do we need to address Inland's count against architects Weinper and Balaban individually inasmuch as it is conditioned upon the success of the other counts pleaded against Weinper and Balaban, Inc.

Accordingly, for the reasons expressed, we affirm the judgment of the circuit court of Cook County.

Affirmed.

STAMOS* and BILANDIC, JJ., concur.

---

*Justice Stamos participated in the decision of this case prior to taking office as a justice of the supreme court.