THIRD DIVISION

June 28, 2002

No. 1-01-1317

LAKE COUNTY RIVERBOAT L.P., by FRGP, L.P., its general partner,

Plaintiff-Appellant,

v.

ILLINOIS GAMING BOARD,

Defendant-Appellee,

and

EMERALD CASINO, INC., formerly known as HP, Inc., DES PLAINES DEVELOPMENT L.P. d/b/a HARRAH'S CASINO CRUISE-JOLIET, THE VILLAGE OF ROSEMONT, an Illinois municipal corporation, and WEST CENTRAL MUNICIPAL CONFERENCE, an Illinois not-for-profit corporation,

Intervening Defendants-Appellees.

) Appeal from the

) Circuit Court of

) Cook County.

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

) The Honorable 

) Robert V. Boharic,

) Judge Presiding.

JUSTICE WOLFSON delivered the opinion of the court:

Mark Twain wrote about the Mississippi River: "It is good for steamboating, and good to drink; but it is worthless for all other purposes, except baptizing."
(footnote: 1)  Not quite. 

In February 1990, the Illinois General Assembly decided riverboat gambling would be an economic benefit to the people of this State.  The legislation authorized the Illinois Gaming Board (the Board) to issue ten licenses for riverboats, the first four of them for gambling on the Mississippi River. 

This case is about one of the first four licenses (the "tenth license"), and it is about the efforts of Lake County Riverboat, L.P. (Lake County) to obtain that license for a gambling boat on the Fox River.  Standing in Lake County's way is a June 1999 statute that allows the Emerald Casino, Inc. (Emerald) to use its Mississippi River license anywhere it wishes, subject to local approval -- 230 ILCS 10/11.2(a) (West 2000).

Lake County filed suit against the Board, asking for a declaration that section 11.2 violates the State Constitution's special legislation provision, Ill. Const., 1970, art IV, sec. 13.  Joining the Board in contending section 11.2 is valid were Emerald, Des Plaines Development, L.P. (Des Plaines), the Village of Rosemont (Rosemont), and the West Central Municipal Conference (West Central).  The trial court never reached the issue of the statute's constitutionality.  It found Lake County lacked standing to challenge the statute and dismissed the lawsuit.  Lake County appeals the order of dismissal.  We affirm.

FACTS

Section 10/7(e) of the 1990 Riverboat Gambling Act (the Act) authorized the Board to issue five licenses to become effective not earlier than January 1, 1991, four of them for gambling on the Mississippi River, the fifth on the Illinois River south of Marshall County.  Another license was to be issued for gambling on the Des Plaines River in Will County "not earlier than March 1, 1992."  That left "four additional licenses."  The Board was given authority to issue them "effective not earlier than March 1, 1992," but no specific location was mandated.  230 ILCS 10/11-2(a) (West 2000). 

In 1992, the Board issued one of the first four licenses authorized for the Mississippi River to H.P., Inc., which later became Emerald.  (For purpose of clarity, we will refer to the licensee as Emerald.) 

Emerald operated a riverboat on the Mississippi out of East Dubuque, Illinois.  Like the other three, Emerald's license was for a duration of three years and could be renewed annually on a showing of adherence to statutory and regulatory requirements.  230 ILCS 10/7(f),(g) (West 1998).

Emerald's license was renewed for one year in July 1996, but the Board expressed concern about Emerald's financial outlook.  In fact, competition from Iowa proved too great, and Emerald stopped operating its riverboat at its dock site on the Mississippi in July 1997.

In June 1997,  Emerald applied for a license renewal.  But not for use on the Mississippi.  Emerald wanted to relocate to Rosemont.  The Board refused to renew the license.  Emerald began to pursue its administrative appeals, first asking for a hearing before the administrative law judge.  The Board asked the ALJ to affirm its denial of Emerald's license renewal application.

On May 5, 1999, the ALJ concluded Emerald's renewal application "failed to meet the requirements of the Riverboat Gambling Act and the Board's decision to deny its renewal application was correct."  In support of his decision, the ALJ observed Emerald did not have a riverboat to operate from, and even if it did the Act did not provide for relocation from the Mississippi.  He said:

"A new application and an opportunity for other parties to participate in the application process for a riverboat casino other than where originally located is required."

Emerald filed two motions for reconsideration of the ALJ's order.  Both were denied.  The matter went back to the Board.  But before the Board had a chance to act on the ALJ's order, the legislature intervened.  Effective June 25, 1999, section 10/11.2 was amended to read:

  "(a) A licensee that was not conducting riverboat gambling on January 1, 1998 may apply to the Board for renewal and approval of relocation to a new home dock location authorized under section 3(c) and the Board shall grant the application and approval upon receipt by the licensee of approval from the new municipality or county, as the case may be, in which the licensee wishes to relocate pursuant to section 7(j)."  230 ILCS 10/11.2(a) (West 2000).

Everyone agrees section 11.2 applies only to Emerald.  This is the statute Lake County challenges as special legislation.

Lake County had not simply been sitting back and observing events.  While the ALJ was reviewing the Board's order denying Emerald's application for renewal, Lake County filed its own application for an owner's license on December 30, 1997. 

Lake County proceeded on the assumption that Emerald had no chance of keeping its license.  Lake County was asking that the former Emerald license be reissued as a new license.  But Lake County, like Emerald, was not interested in the Mississippi River as a location.  It wanted to put its boat in the Fox River, in

Lake County.

On February 17, 1998, the Board denied Lake County's application "without prejudicing the applicant," noting that no judgment was being made on the substantive merits of the application.  The Board apparently was recognizing there was no "tenth license" available, since Emerald still held it.  At the same time, the Board unanimously directed its staff to "revise the current owner's application form and develop a competitive process to be implemented in the future for the solicitation of applicants for an owner's license and the uniform submission and review of information by each applicant."

Lake County did not appeal the Board's denial, giving rise  to defendants' claim in this lawsuit that Lake County failed to exhaust its administrative remedies.

Passage of section 11.2 changed everything.  Board action on the ALJ recommendation that Emerald's license not be renewed came to a halt.  The proceeding was pronounced "moot" on September 7, 1999.  The Board had no choice.  Emerald and only Emerald could file an application for renewal and relocation of the tenth license.

On October 8, 1999, Lake County filed its complaint in the Lake County Circuit Court, challenging the constitutionality of section 11.2.  After legal wrangling not relevant to our decision the case was transferred to Cook County, where the trial judge granted the defendants' section 2-619 motions to dismiss (735 ILCS 5/2-619 (West 2000)), holding Lake County lacked standing to challenge the statute and that it failed to exhaust its administrative remedies.  Lake County appeals.

DECISION

In this appeal the standing issue is paramount.  That is where we focus our attention.  We review the trial court's dismissal 
de
 
novo
.  
Prodromos v. Howard Savings Bank
, 295 Ill. App. 3d 470, 474, 692 N.E.2d 707 (1998).  We take Lake County's well-pleaded allegations as true when deciding whether there exists any set of facts that would entitle the plaintiff to recover.  
B&B Land Acquisition, Inc. v. Mandell
, 305 Ill. App. 3d 1068, 1071, 714 N.E.2d 58 (1999).

STANDING

First, we review the standing doctrine, especially as it applies to parties who challenge the constitutionality of a statute.

In order to challenge section 10/11.2 Lake County must have sustained or be in immediate danger of sustaining a direct injury as a result of enforcement of the statute.  
Flynn v. Ryan
, No. 90--263, slip op. at 6 (Ill. May 23, 2002).  The alleged injury must be (1) distinct and palpable, (2) fairly traceable to defendant's actions, and (3) substantially likely to be prevented or redressed by the grant of the requested relief.  
Chicago Teachers Union v. Board of Education
, 189 Ill. 2d 200, 207, 724 N.E.2d 914 (2000).

Because lack of standing is an affirmative defense, the defendants must plead and prove it.  
Chicago Teachers Union
, 189 Ill. 2d at 206.

The defendants' contentions come down to two propositions, either of which, they say, defeats Lake County's standing to challenge the statute: first, Lake County has no right to the tenth license because Emerald holds it; second, the pre-amendment Act did not permit Emerald's license to operate anywhere but on the Mississippi.

If the defendants are correct about either of the propositions they raise, Lake County's challenge to the constitutionality of section 10/11.2 becomes an abstract question, interesting perhaps, but not the kind of issue our courts are designed to litigate since there would be no real controversy which Lake County has a direct interest in resolving.  See 
Inland Real Estate Corp v. Tower Construction
, 174 Ill. App. 3d 421, 425, 528 N.E.2d 421 (1988).

Lake County contends the only barrier to its standing to challenge section 10/11.2 is the statute itself.  Without it, Emerald's license would have been available for competitive bidding by serious bidders.  That is, once Emerald was denied renewal of its license, a new license would be issued to a new owner, who then could ask the Board to get away from the Mississippi River and dock in the Fox River.

The defendants say a conclusion that Emerald would have lost its license would be nothing more than impermissible speculation.  They compare Lake County's position to the claims made by the physical education teachers in 
Chicago Teachers Union v. Board of Education
.  There, the teachers challenged a statute that allowed school districts to petition the State Board of Education for waiver of School Code mandates, used in that case to waive physical education requirements for eleventh and twelfth grade students.  The teachers claimed the waiver reduced job security and career opportunities.  The Court, noting that physical education classes still would be offered, held there was no real harm to the teachers, that any adverse consequences to job security were purely speculative.  Thus, no standing.

Both sides in this case find some support for their positions in 
Nolan v. Hilliard
, 309 Ill. App. 3d 129, 722 N.E.2d 736 (1999).  

The case concerned the City of Chicago Police Department's plan for promoting patrolmen to sergeants.  It began with a written qualifying test scheduled for January 10, 1998.  Officers who passed the written test would be placed on a merit eligible list and would be considered for promotion pursuant to a merit selection process.  Further, an applicant would have to have a minimum of 60 semester hours of college credit to be eligible for promotion.  
Nolan
, 309 Ill. App. 3d at 129-34.

Officer Jaconetti applied for the 1998 sergeants examination.  But he did not have the required level of college education.  He did not take the written test.  He joined others in suing the City, asking that the City be permanently enjoined from implementing the education requirement as a prerequisite to promotion, and from making any promotion based on merit or any factor other than the results of competitive testing.  
Nolan
, 309 Ill. App. 3d at 134.

The trial court dismissed the case, deciding that Jaconetti and the others did not have standing to challenge the department procedures for promotion.  The results were mixed on appeal.

The court held Jaconetti had standing to challenge the college education requirement.  True, as the City contended, he did not take the written test, but that does not defeat standing since Jaconetti was "clearly injured" by the education requirement whether or not he took the test.  
Nolan
, 309 Ill. App. 3d at 140.  That is, "Jaconetti's injury would not have been alleviated by sitting for the January qualifying test."  
Nolan
, 309 Ill. App. 3d at 140.  If he had taken it and had scored high, he still would have been excluded from the promotional process.  That is an actual controversy between the parties, and Jaconetti had standing to attack the education prerequisite.

It was a different matter for Jaconetti's standing to attack merit-based promotions.  Jaconetti did not have a sufficient interest in that claim because he was not on the merit promotion eligibility list.  That is, even if the court were to determine the merit component of the exam process was invalid, Jaconetti would not benefit from that ruling because he withdrew from the promotional process without taking the qualifying test.  He could not have been considered for promotion, merit-based or otherwise, without first having taken the written test.  He did not sustain a direct injury, and he was not "in immediate danger of sustaining a direct injury as a result of the complained-of conduct."  
Nolan
, 309 Ill. App. 3d at 138.

The reported cases stake out the territory in this case, but

they provide only general guidance to the specific questions that are raised.  Whether Lake County has standing to challenge section 10/11.2 depends on whether Emerald's license would have been available for competitive application and whether the license was geographically restricted to the Mississippi River in the absence of legislation that would authorize relocation. 

We will address the two issues separately.  We believe the best way to look at them is to play out the scenario as if section 10/11.2 had not been enacted, although we recognize that factual extrapolation can be a risky business.

THE EMERALD LICENSE

By June 1999, when section 10/11.2 was enacted, Emerald was well on it way to losing its license.  The Board had denied renewal.  The ALJ had affirmed that denial.  The Board was headed toward termination of the license.

Emerald contends in this appeal that the license could have been used only on the Mississippi, although before June 1999 it was asking permission to relocate to Rosemont.  If Emerald's  license was restricted to the Mississippi, it was useless because Emerald had no boat on the Mississippi and no inclination to do business on the Mississippi.  Emerald was marking time.

The Board's February 17, 1998, denial of Lake County's application was "without prejudicing the applicant," and the Board, anticipating a license would become available, directed its staff to gear up for competitive bidding.

Lake County was a serious potential bidder, having spent substantial time and expense on its hopes for a Fox River license.

Of course, had the Board entered a final termination order, Emerald would have a right to administrative review in the courts.  Once in court, Emerald could have asked for a stay of the Board's final order.  See 5 ILCS 100/10-65(b) (West 2000).  Whether a stay would have been granted is a question we are in no position to answer.

Given the circumstances, we do not see how Emerald could have saved its license.  Sooner or later, most likely sooner, the license would have been gone.  It could be Emerald would have been able to delay the inevitable during the review process, but it was a matter of time. 

We believe Lake County had a realistic pre-amendment hope of becoming a competitive bidder for the tenth license, maybe not immediately, but soon.

We do not believe the defendants' comparisons of 
Chicago Teachers Union
 and 
Nolan v. Ryan
 to the facts of this case are  persuasive on this point.  The evidence that Emerald was about to lose its license is compelling, not speculative.

We also do not agree with defendants that Lake County has to prove it would have been the successful bidder in order to establish standing.  We know of no such requirement.  In other settings, not directly on point here, we have protected the standing of unsuccessful bidders to challenge unlawful governmental actions.  See 
Cardinal Glass Co. v. Board of Education
, 113 Ill. App. 3d 442, 447, 447 N.E.2d 546 (1983); 
Stanley Magic-Door, Inc. v. City of Chicago
, 74 Ill. App. 3d 595, 597, 393 N.E.2d 535 (1979) ("palpable economic injuries have long been recognized as sufficient to lay the basis for standing with or without a specific statutory provision for judicial review").

To buttress their claim that Lake County suffered no direct injury from passage of section 10/11.2, the defendants observe the amendment was enacted about a year after Lake County's application for a license was denied without prejudice.  During that time, Lake County did not appeal the denial.  Given the circumstances of the license denial, we do not see much significance in the period of Lake County's inactivity.  The license was not available to anyone other than Emerald during that time, but the Board was moving inexorably toward termination and a new set of competitive rules for applicants.  Lake County's attorney had been told by the Board "no prejudice" attached to the denial of the application, and: "your client may apply for an owner's license when such a license becomes available."  Lake County, after expending substantial amounts of time and money, could do little else but stand and wait.

Lake County's position was not much different than Officer Jaconetti's situation in 
Nolan v. Ryan
.  He was "clearly injured" by the education requirement established by the City, whether or not he took the test.  
Nolan
, 309 Ill. App. 3d at 140.

Whether this means Lake County has demonstrated it is in  immediate danger of sustaining a direct injury as a result of enforcement of section 10/11.2 depends on whether the pre-amendment Act geographically restricts the tenth license to the Mississippi River.

THE MISSISSIPPI RIVER

If Emerald's license were to become available during life without section 10/11.2, could the Board have granted Lake County the right to use it on the Fox River?  If not, Lake County's claim to direct injury crumbles.  It would have no "real interest in the outcome of the controversy."  
Chicago Teachers Union
, 189 Ill. 2d at 206.

Lake County suggests we allow the Board to determine whether the tenth license can be used on the Fox River, but the issue before us is Lake County's standing to challenge a statute, and that is the issue we must decide.  Doing so, we are not entitled to make any comment on the constitutionality of section 10/11.2.

We also observe that in this appeal, for reasons that are unclear to us, the Board takes the position it had not been given the legislative authority in the 1990 Act to relocate Emerald's license from the Mississippi should it be revoked or terminated and reissued to a new licensee.

All defendants contend section 10/7(e) of the 1990 statute is clear: the Board has no discretion to relocate any of the first six licenses since the statute places them on specific waterways.  They say only the legislature can move them.  The Board's discretion is reserved for the last four "additional licenses."  The geographical restriction is "insurmountable."

Not so, responds Lake County.  The pre-amendment statute gives the Board discretion to reissue a revoked or terminated license as a "new" license to a "new" owner for a "new" location.

Our examination of the Riverboat Gambling Act (230 ILCS 10/1 
et
 
seq
. (West 2000)) reveals no specific reference to the fate of licenses that are revoked or terminated.  Nothing is said anywhere in the statutory scheme about locations for "new" licenses or reissued licenses.  

Section 10/7(e) contains three paragraphs, two of them  relevant to our inquiry.  The first paragraph sets the license limit at ten.  Five of the licenses would become effective not earlier than January 1, 1991, four of them on the Mississippi, the fifth on the Illinois River.  Another was to be issued for the Des Plaines River in Will County "not earlier than March 1, 1992."  Of the "four additional licenses," to be issued "effective not earlier than March 1, 1992," no specific location was mandated, leaving it to the Board to determine location.  The meaning of the sentence that then concludes the first paragraph is at the heart of the dispute:

"In determining the navigable streams upon which riverboats will operate with 
licenses effective on or after March 1, 1992
, the Board shall consider the economic benefit which riverboat gambling confers on the State, and shall seek to assure that all regions of the State share in the economic benefits of riverboat gambling."  (Emphasis added.)  230 ILCS 10/7(e) (West 1998). 

Further complicating matters is the second paragraph of

section 10/7(e):

   "In granting 
all licenses
, the Board may give favorable consideration to economically depressed areas of the State, to applicants presenting plans which provide for significant  economic development over a large geographic area, and to applicants who currently operate non-gambling riverboats in Illinois.  The Board shall review all applicants for owners  licenses, and shall inform each applicant of the Board's decision."  (Emphasis added.)  230 ILCS 10/7(e) (West 1998).

The defendants contend the "In determining" sentence that concludes paragraph one applies only to the last "four additional licenses," not to any of the first four placed on the Mississippi.  That, say the defendants, defines the limits of the Board's discretion.

Lake County claims the sentence applies to any "new" or reissued license -- the "tenth license," which Emerald's former license would be.  That is, once one of the original four Mississippi River licenses is terminated or revoked, it is reissued as a new license, "effective on or after March 1, 1992," triggering the Board's discretion to consider the economic benefits gambling brings to all regions of the State.  Lake County emphasizes it does not seek a transfer or relocation of Emerald's license, it seeks to compete for a newly available license after Emerald's application for renewal is denied.

Neither side offers any insight into the meaning or purpose  of the second paragraph of section 10/7(e), which begins: "In granting 
all licenses
 ***."  (Emphasis added.)  We cannot ignore the paragraph, because "statutes should be construed so that language is not rendered meaningless or superfluous."  
People v. Singleton
, 103 Ill. 2d 339, 345, 469 N.E.2d 200 (1984).

We know the legislature considered the possibility that a license would be revoked or terminated.  See, for example, sections 10/5(b)(1), (11), (15); section 10/7(g).  We also know each license was issued for a 3-year period, renewable on meeting certain conditions.  Section  10/7(g).  Yet, we cannot find anywhere in 230 ILCS 10/1 
et
 
seq
. (West 2000) a clear statement about the Board's authority to relocate any of the first six licenses should it be revoked or terminated.  On the other hand, nothing in the statute specifically requires that the first six licenses remain on the designated waterways until the legislature moves them.  We must deal with legislative reticence.

The defendants rely heavily on two opinion letters issued by the Illinois Attorney General, 1995 Ill. Att'y Gen. Op. __, No. 95-011, and 2001 Ill Att'y Gen. Op. 004, especially the 1995 opinion.  The last paragraph of the Attorney General's 1995 opinion:

"I would note, however, that as section 7 is currently written, it appears to require that four riverboats be licensed to operate on the Mississippi River, one on the Illinois River south of Marshall County and one on the Des Plaines River in Will County.  There is nothing in the Act that indicates that licenses issued subsequent to the initial licenses are exempt from that requirement.  Consequently, in issuing new licenses, the Gaming Board will have to ensure that the statutorily-imposed balance is maintained, unless it is repealed or modified legislatively."  1995 Ill. Att'y Gen. Op. __, No. 95-011.

We are reluctant to give that last paragraph too much weight.  First, the Attorney General was being asked only whether a current licensee could relocate its riverboat gambling operations.  Second, there are other references in the opinion letter that could be seen as inconsistent, depending on how they

are interpreted.  For example:

"Following the expiration or termination of the licenses initially authorized, however, the 
Illinois Gaming Board
 may issue owners licenses for different locations in accordance with the criteria established by the 
Riverboat Gambling Act
 (230 ILCS 10/1 
et
 
seq
. (West 1994))."  (Emphasis in original.)  1995 Ill. Att'y Gen. Op. __, No. 95-011.

And,

"This does not necessarily mean that an owner will be precluded, in all circumstances, from applying for and receiving a license for a different location."  1995 Ill. Att'y Gen. Op. __, No. 95-011.

The 2001 opinion letter does not shed any additional light.  It is addressed to the question of whether a current Mississippi River license could be authorized for mooring at an inland location within the same community.  The answer was no, but of little interest to us.

Our primary task is to ascertain and give effect to the true intent of the legislature.  
Palos Community Hospital v. Illinois  Health Facilities Planning Board
, 328 Ill. App. 3d 336, 339, 765  N.E.2d 1187 (2002).  Because we are unable to determine the legislature's intent from the words of the statute, we are  allowed to resolve the statute's ambiguity by considering its legislative history and debates, and by examining the statute's purposes and underlying policies.  
Advincula v. United Blood Services
, 176 Ill. 2d 1, 19, 678 N.E.2d 1009 (1997).

Nowhere in the legislative debates of 1989 and 1990 do we find any indication the legislature intended to give the Board authority to relocate any of the first four licenses from the Mississippi to some other waterway in the event one of those licenses was reissued to a new licensee.  We see a consistent and persistent commitment to gambling boats on the Mississippi River, without any apparent concern for the financial viability of those enterprises.  The wisdom of legislative choice is not for us to determine.

Excerpts from the 1989 and 1990 debates confirm legislative commitment to the Mississippi River:

The sponsor of Senate bill 572, Senator Denny Jacobs, explained the purpose of the bill:

"This bill sets out a rigorous plan for regulating riverboat gambling.  *** A number of Illinois communities, in regard to tourism, could use some of that ***.  In fact, river towns all along southern Illinois, two shore lines could *** use a shot in the tourism arm.  Excursion boats cruising up and down the Mississippi River might be just the ticket."  86th Ill. Gen. Assem., Senate Proceedings, May 26, 1989, at 243-44 (statements of Senator Jacobs).

Later, Representative Brunsvold declared the broader goal of the bill:

"This Bill in Illinois was introduced by Senator Jacobs, my senator, and started in the Senate and had approval in the Senate, had some changes in the task force in the House.  We're at a point now where we have 10 licenses at the discretion of the board.  The overall concept of riverboat gambling was for tourism and economic development along the Mississippi River.  That and along with the Illinois River in Peoria, seems to me to be the ideal location for riverboat gambling."  86th Ill. Gen. Assem., House Proceedings, June 22, 1989, at 93-94 (statements of Representative Brunsvold).

When the bill returned to the Senate, Senator Jacobs explained how the legislation was changed:

"This bill has been changed slightly, in order to allow four licenses on the Mississippi River and one license on the Illinois River for -- effective January of 1990.  And then the other five licenses that were referred to earlier, to -- phase in in 1991."  86th Ill. Gen. Assem., Senate Proceedings, June 30, 1989, at 243-44 (statements of Senator Jacobs).

In response to Senator Jacobs' explanation, Senator Karpiel said, "I do not want gambling boats on the Fox River."  Karpiel asked, "How [do] we prevent this from happening on other rivers in the State of Illinois?"  86th Ill. Gen. Assem., Senate Proceedings, June 30, 1989, at 387 (statements of Senator Karpiel).

Senator Jacobs replied:

"Well, Senator.  Under this particular legislation, as the draft is now, you have two protections.  Number one, under the first -- the first licenses that -- that are to be given, four will be on the Mississippi; one, will be on the Illinois.  So that excludes any other river, other than those.  The second portion, which is the trigger-in, comes a little bit later, which is in January 1991.  So at that time, we would have an opportunity, as a Body, that if we felt that a particular river does not want to be in, we can come back and legislatively say that."  (Emphasis added.)  86th Ill. Gen. Assem., Senate Proceedings, June 30, 1989, at 387 (statements of Senator Jacobs).

After the bill was approved in the Senate, Representative Brunsvold repeated the general understanding of the purpose of the bill:

"The last decade, the eighties, has been a very interesting decade for our area.  We were, since 1930, pretty recession-proof.  We had Cat, John Deere, Farmall.  We had the ag[ricultural] industry there that pretty much was stable for all those years.  In 1980 everything collapsed.  We've been struggling through the eighties, trying to diversify, get more jobs in the Quad Cities.  Riverboat gambling?  Is that the answer?  No, that's not the answer, but it's a piece of the puzzle that can help us in a different area.  Tourism.  We have one of the greatest attractions in the world.  People say, 'Where are you from?' and I say, "I'm from the Quad Cities.'  'Well, where's that?'  'Well, it's on the Mississippi River.'  'I know where that is.'  The Mississippi River is important to our area.  It's a tourist attraction.  Riverboat gambling is part of the history of that Mississippi River.  Having two licenses of four boats on the Mississippi River would be a magnet for tourists to our area[, the Quad Cities.]"  86th Ill. Gen. Assem., House Proceedings, January 11, 1990, at 51-52 (statements of Representative Brunsvold).

If the legislature wanted to authorize the Board to issue new licenses for new locations when an existing Mississippi River license was revoked or terminated, it easily could have done so.  It chose not to.  We are not inclined to amend the legislation by judicial fiat.

Our conclusion is supported by the 1999 amendments to the  Act, constitutional or not.  Section 10/11.2, the section under attack by Lake County, permits relocation of Emerald's license but does not allow change of location of the other Mississippi River licenses.  Section  10/7(e) was amended to conform to section 10/11.2; it now reads:  "Three of such licenses shall authorize riverboat gambling on the Mississippi River ***."  There is no indication those licenses could be relocated by the Board should they be revoked or terminated.  No additional powers to relocate were granted to the Board.

During the 1999 debate on the amendments, the House sponsor, Representative Brunsvold, was asked whether the amendment would

allow other boats to be relocated to new sites:

"Davis, S.: One other question. The boats who are currently on the Mississippi River.

Brunsvold: Correct.

Davis, S.: Okay. Under current law, what is the current law regarding the moving of these boats to another site? 

And ...

Brunsvold: There is no language.

Davis, S.: There is no language. Is there language in this Bill that would require three boats to remain on the Mississippi River?

Brunsvold: Yes, there is. The language was changed to ... from four to three, now.  And this three is in this ... is in this Bill that would require to be ... remain on the Mississippi River. 

Davis, S.: I want to make sure, for the record, that ...

Brunsvold: There are three boats.

Davis, S.: ... that is very clear, that three boats will remain on the Mississippi River.  That they will not end up in Cook County or in the City of Chicago.

Brunsvold: This is the number that's been in the language all along the process."  (Emphasis added.)  91st Ill. Gen. Assem., House Proceedings, May 20, 1999, at 185-86 (statements of Representatives Davis and Brunsvold).

The Board has no general or common law powers.  
Daniels v. The Industrial Commission
, No. 90--318, slip op. at 4, (Ill. March 21, 2002).  The only powers it possesses are those granted to it by the legislature.  Any action it takes must be specifically authorized by statute.  
Business & Professional People for the Public Interest v. Illinois Commerce Commission
, 136 Ill. 2d 192, 243-44, 555 N.E.2d 693 (1989).

Based on all we have said, we conclude the Riverboat Gambling Act of 1990 does not give the Board discretion to issue any of the first six licenses for a location away from their statutorily designated navigable streams, even where a license  is revoked or terminated and reissued to a new licensee.  For that reason, Lake County would have had no chance of winning Emerald's revoked or terminated license for use on the Fox River.  It follows, then, Lake County has no standing to challenge the constitutionality of section 10/11.2 because it has not sustained and is not in immediate danger of sustaining a direct injury as a result of the enforcement of the statute.  
Chicago Teachers Union
, 189 Ill. 2d at 206.

CONCLUSION

Lake County has no standing to challenge the constitutionality of section 10/11.2.  Because we reach this conclusion, there is no reason to inquire into the exhaustion of remedies argument made by the defendants.  We affirm the judgment of the trial court.

AFFIRMED.

HALL, P.J., and SOUTH, J., concur.

FOOTNOTES
1: M. Twain, Life on the Mississippi, Chapter 22 at 113, Reissue edition (May 1997).